UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEXINGTON INSURANCE COMPANY,

    Plaintiff(s),

v.

SANDRA SWANSON,

    Defendant(s).

NO. C05-1614P

**AMENDED** ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The above-entitled Court, having received and reviewed:

1. Plaintiff Lexington Insurance Company's Motion for Partial Summary Judgment

2. Defendant Swanson's Opposition to Lexington's Motion for Summary Judgment

3. Plaintiff Lexington Insurance Company's Reply in Support of Its Motion for Partial Summary Judgment

4. Defendant Swanson's Surreply to Lexington's Summary Judgment Motion and Request to Strike Declaration of DuBrin

5. Lexington's Objection and Response to Defendants Memorandum of Supplemental Authority re: Lexington's Summary Judgment Motion

and all exhibits and declarations attached thereto, makes the following ruling:

IT IS HEREBY ORDERED that the motion is DENIED.

In the course of the briefing on this motion, the parties made a series of motions to strike portions of each other's evidentiary and other submissions. Those motions will be addressed in the body of the discussion *infra*.

**AMENDED ORD ON S/J MOTION - 1**

**Background**

Defendant Sandra Swanson ("Swanson") suffered a stroke and moved into the Issaquah Care Center ("ICC") because she could no longer take care of her needs independently. There she was the victim of severely negligent care resulting in, among other things, the loss of parts of one arm, one leg and her teeth.

In 2003, Ms. Swanson filed a state court action against ICC. Plaintiff Lexington Insurance Company ("Lexington") insured ICC on the basis of $1 million limit per "single medical incident" (with a "3-incident, $3 million" cap). Lexington rejected an initial settlement offer (for the "remaining policy limits" according to Swanson [Response, p.5], which the Court interprets to mean $1 million) in June 2003. In June 2004, Lexington rejected another offer for the "remaining policy limits" – $950,000 at that point. In September 2004, Lexington offered an $800,000 settlement ($1 million minus $200,000 in defense costs) which Swanson rejected. At that point, the parties went to agreed arbitration. In August 2005, the arbitrator awarded Swanson over eight million dollars. Swanson alleges a series of actions by Plaintiff following that award which further increased ICC's potential liability.

Lexington filed this declaratory judgment action against ICC in September, 2005. In December 2005, at a sheriff's sale following entry of judgment based on the arbitration award, Swanson purchased all "choses in action" owned by ICC, including any claims it might have against Lexington for policy coverage or bad faith failures. On that same day, Lexington amended its Complaint in the declaratory judgment before this Court to include Ms. Swanson and ICC manager Robin DuBrin as additional defendants. On December 21, 2005, Ms. Swanson amended her state court action against ICC to include Lexington as a defendant. Lexington removed that action to this Court on January 4, 2006 and it was assigned to Judge Lasnik. Swanson filed a motion for remand in that

**AMENDED ORD
ON S/J MOTION - 2**

action, which was denied by Judge Lasnik on March 10, 2006; that same day, Judge Lasnik transferred that case to this Court.

In her counterclaim in this declaratory judgment suit, Swanson has alleged the bad faith claims that Plaintiff seeks to dismiss by way of this motion for partial summary judgment.

**Discussion**

Motions to strike

Both parties have filed a series of motions to strike which the Court will dispose of before proceeding to the substantive aspects of Lexington's motion.

***Declaration of Mary Nester, Esq***: Ms. Nester was counsel for ICC during the litigation involving ICC and Swanson and Defendant offers a declaration from her which goes to Lexington's refusal to provide coverage or pay her legal fees as part of ICC's defense. Lexington objects to this evidence as a violation of the attorney-client privilege (arguing that, since Nester does not say where she got her information, it "must" have come from her former client). This request is not well-taken on a number of grounds.  First of all, the evidence to which Lexington objects ("...factual allegations regarding denials of coverage or the underlying King County case..." Pltf Reply, p. 2) goes primarily to issues of bad faith which Lexington admits are not relevant.  To the extent that Nester's evidence is relevant to the issue of "harm," it concerns the fees generated by her work for ICC on the Swanson case, which she alleges that Lexington did not compensate ICC for.  Information regarding attorney fees and payments is not generally subject to the attorney-client privilege.  *See, e.g.,* In re Grand Jury Supoenas (Hirsch), 803 F.2d 493, 496 (9th Cir.1986); In re Osterhoudt, 722 F.2d 591, 592 (9th Cir.1983).  Perhaps more to the point, the privilege is not Lexington's to assert – Nester is not Plaintiff's counsel.  In her second declaration, Robin DuBrin of ICC (*see infra*) includes a boilerplate

**AMENDED ORD
ON S/J MOTION - 3**

"non-waiver" of the privilege "<u>to the extent</u>" that Nester's declaration is based on communications between client and attorney, but she never claims that anything Nester asserts was a result of such communications.[1]  **DENIED.**

***Second Declaration of Robin DuBrin***: DuBrin is the "Managing Member" of ICC.  She submitted an initial declaration in Plaintiff's opening brief to which Swanson has made no objection.  Plaintiff filed a second DuBrin declaration with its reply brief – in this declaration, DuBrin offers (among other things) her opinion that Lexington "capably defended" ICC against Swanson's claims, that ICC has not declared bankruptcy because it has no assets and that there are no future business opportunities which could be adversely impacted by the award made to Swanson.  Swanson objects to this second DuBrin declaration on two grounds: first, the impropriety of Lexington introducing new evidence on the issue of "harm" in its reply brief; and, second, to the speculative and hearsay nature of much of her declaration.  The objections are well-taken (this evidence should have been brought forward in Plaintiff's opening brief and some of it is improper speculation and hearsay) and the Court did not consider the second DuBrin declaration in reaching the decision on this motion.  **GRANTED.**

***Declaration of Sharon Sobers***: Ms. Sobers is a Claims Director with the claims agency for Lexington; Defendant objects to Sobers' testimony in her declaration that "Lexington was informed in June of 2004. . . that ICC was insolvent," which is based on her review of a communication from someone else in her company about ICC. (Sobers Decl., ¶ 5) The evidence is double hearsay (a memo reporting a conversation with someone in ICC), with no foundation laid for an exception.  **GRANTED.**

***Swanson's supplemental authority***: claiming that it is adverse authority that Plaintiff was obligated by the Rules of Professional Conduct to distinguish or otherwise controvert, Defendant filed

---

[1] The Court acknowledges that it is by no means settled whether Swanson's purchase of ICC's "choses in action" included the right to assert ICC's attorney-client privileges in those actions.

**AMENDED ORD ON S/J MOTION - 4**

1  a supplemental brief after the close of briefing, citing an opinion by Judge Coughenour of this district

2  (Specialty Surplus Ins. Co. v. Second Chance, Inc., 412 F.Supp.2d 1152) which, in fact, both parties

3  were aware of (having cited it in an earlier motion for a protective order).  The case is the opinion of

4  another District Court and therefore not controlling authority in any event, but  Defendant offers no

5  reason for having failed to produce it until after the close of briefing.  **STRICKEN.**

6  Substantive argument: the issue of "harm"

7        The parties are agreed that Swanson's counterclaims against Lexington based on allegations of

8  "bad faith" are subject to the classic tort analysis: "Claims by insured against their insurers for bad faith

9  are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages

10  proximately caused by any breach of duty."  Smith v. Safeco Ins. Co., 150 Wn.2d 478, 485 (2003).

11        As Plaintiff put it in its opening brief: "The only issue at stake in this Motion is whether

12  Swanson's bad faith claims fail because ICC could not have been, and was not, 'harmed' by any aspect

13  of Lexington's claims handling of the underlying matter."  Pltf Brief, p. 2.  It is Lexington's position

14  that ICC's insolvency rendered it immune to any excess judgment and, as a matter of law, that entity

15  was therefore incapable of being damaged by Lexington's actions.

16        Plaintiff's motion fails from the outset.  The party moving for summary judgment has the

17  burden to show initially the absence of a genuine issue concerning any material fact (Adickes v. S.H.

18  Kress & Co., 398 U.S. 144, 159 (1970)) by either producing evidence negating an essential element of

19  plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to

20  carry its ultimate burden at trial.  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d

21  1099, 1103 (9th Cir. 2000).  Lexington has not succeeded in carrying that burden.

22        Lexington has essentially placed all its eggs in one basket by relying exclusively on its proof

23  that ICC is a company without assets, then arguing from that fact that no tortious "harm" could befall

24  it; therefore (the argument goes), it can maintain no suit arising out of the facts described *supra*.

25

26  **AMENDED ORD**
**ON S/J MOTION - 5**

Plaintiff's primary legal authority for this position is <u>Werlinger v. Clarendon Nat'l Ins. Co.</u>, 129 Wn.App. 804 (2005). In that case, the insured (Warner) had filed a Chapter 13 bankruptcy prior to causing the auto accident which killed Werlinger; two months after the accident, Warner converted the action to a Chapter 7 proceeding, but not (the court found) in response to any action by Werlinger's insurer (Clarendon). Following his discharge in bankruptcy, Warner executed an agreement with Werlinger's estate in which he confessed a $5 million judgment in exchange for the estate's promise not to hold him personally liable. The appellate court upheld the finding that the settlement was unreasonable because Warner's bankruptcy discharge meant that he was immune to the damages he was confessing. Furthermore, his bankrupt status eliminated the possibility that any judgment in excess of his insurance limits which occurred as a result of Clarendon's misfeasance could "harm" him. Therefore, the <u>Werlinger</u> court reasoned, Clarendon's alleged bad faith was not actionable. <u>Id.</u> at 809.

      Lexington claims that <u>Werlinger</u> stands for the proposition that "where, as here, there were no assets which could be exposed by the insurance company's alleged failure to settle, no 'harm' could have occurred, as a matter of law." Pltf Reply, p. 4. In actuality, the opinion does not say that and its ruling is much more narrowly drawn. The facts of this case are sufficiently distinguishable from <u>Werlinger</u> to render it inapposite: the absence of a bankrupt party (much less a bankruptcy filed <u>before</u> the tortious conduct) and the absence of a sham agreement represent critical differences between the instant case and the case upon which Lexington relies.

      Furthermore, there is dicta in the opinion which leads to the conclusion that there are types of cognizable "harm" which can exist regardless of the injured party's current financial condition. After noting with approval the trial court's conclusion that Warner's bankruptcy insulated him from any harm resulting from Clarendon's bad faith delays, the appellate court also notes the lower court's finding that "the Werlingers presented no competent evidence of *other* injury." 129 Wash.App. at 808

**AMENDED ORD
ON S/J MOTION - 6**

(emphasis supplied).  The implication is clear that, even in the face of insolvency, there is evidence of other injury which could be presented to support a finding of harm (the Werlinger court cites the possibility of proving "emotional distress" from the insurance company's actions).  Id. at 809.

The evidence indicates that, although it may be presently without assets, ICC is in fact still listed with the Washington State Department of Licensing as an active, for-profit company.  Decl. of Beninger, Exh. 14.  Its current insolvency does not render it immune from a judgment which is capable of being periodically renewed and which will act as a deterrent to any attempt to revive this company as a viable business entity.  It is the ruling of this Court that the existence of an $8 million judgment against a party not in bankruptcy or otherwise legally insulated from such a judgment constitutes "harm" as a matter of law.

Swanson, prosecuting this litigation in the shoes of ICC, has also alleged that the bad faith refusal of Lexington to settle Swanson's claim has resulted in the unnecessary expenditure of a portion of ICC's insurance policy (through a "spend-down" provision in the contract).  It is the further finding of this Court that "harm" can be found where, as here, a party possesses the asset of an insurance policy and alleges that the bad faith actions of its insurer have resulted in a diminishment of that asset by such means as a bad faith "spend-down" of the policy amount.

**Conclusion**

Plaintiff Lexington Insurance Company has failed to produce evidence which effectively negates any essential element of Defendant's cross-claim.  Accordingly, its motion for partial summary judgment will be DENIED.

The clerk is directed to provide copies of this order to all counsel of record.

Dated:  November 29, 2006

Marsha J. Pechman
U.S. District Judge

**AMENDED ORD
ON S/J MOTION - 7**