UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>SANDRA SWANSON,<br><br>　　　　Defendant. | No. C05-1614P<br><br>ORDER ON CR 37 SUBMISSION REGARDING REQUESTS FOR PRODUCTION NO. 1 (CLAIMS FILE) |

　　　This matter comes before the Court on a joint submission by the parties pursuant to Local Civil Rule (CR) 37. (Dkt. No. 81). Through this submission, Defendant Sandra Swanson has moved to compel Plaintiff Lexington Insurance Company ("Lexington") to produce documents in response to her Request for Production (RFP) No. 1. Lexington has withheld production of a number of documents responsive to this RFP on the basis of attorney-client privilege, work product protection, and/or relevance. Lexington has not provided the disputed documents for an *in camera* review by the Court, nor has Ms. Swanson argued that an *in camera* review is necessary.

　　　The Court has reviewed the materials submitted by the parties, including supplemental materials filed by Lexington. On the record before it, the Court GRANTS in part and DENIES in part Ms. Swanson's motion to compel. The Court ORDERS as follows:

ORDER - 1

(1) The Court GRANTS Ms. Swanson's motion to the extent she seeks production of documents withheld by Lexington solely on the basis of a so-called "ICC/Lexington" privilege assertion. Lexington shall produce such documents to Ms. Swanson within <u>seven (7) calendar days</u> of the date of this order.

(2) The Court GRANTS Ms. Swanson's request to compel production of documents that have been withheld on the grounds that they contain "reserve information." Lexington shall produce such documents to Ms. Swanson within <u>seven (7) calendar days</u> of the date of this order.

(3) The Court DENIES Ms. Swanson's request to compel production of documents withheld by Lexington on the basis of "Lexington-only" privilege assertions, without prejudice to Ms. Swanson's ability to file a renewed motion requesting an *in camera* review of these documents. Before any renewed motion is filed, however, the parties must meet and confer to attempt to narrow or resolve the dispute without the Court's intervention. Any renewed motion must be filed as a joint submission pursuant to CR 37.

**Background**

The background for this case was set forth in the Court's prior order on Lexington's motion for partial summary judgment. To summarize, Ms. Swanson was the victim of severely negligent care at Issaquah Care Center (ICC). Ms. Swanson filed a state court action against ICC. The parties went to agreed arbitration, in which Ms. Swanson obtained a judgment in excess of $8 million against ICC. Lexington insured ICC under a policy that contained a $1 million limit per "single medical incident," with a "3-incident, $3 million" cap.

In September 2005, Lexington filed an action against ICC in this Court, seeking a declaratory judgment regarding its coverage obligations under the policy. Lexington amended its complaint in October 2005 to add Ms. Swanson and Robin DuBrin (identified as an owner of ICC) as defendants.

In December 2005, Ms. Swanson purchased all claims that ICC may have against Lexington. After Ms. Swanson purchased ICC's claims, Lexington amended its complaint and added a request for

ORDER - 2

a declaratory judgment that it "did not violate the Washington Consumer Protection Act or otherwise commit any act of 'bad faith' claims handling (or allegedly related acts) in the administration of the claim." ICC and Ms. DuBrin have been dismissed from this action by stipulation, leaving Ms. Swanson as the only defendant.[1]

Acting as ICC's assignee, Ms. Swanson has asserted a number of counterclaims against Lexington. She alleges that Lexington rejected offers to settle for policy limits, refused to negotiate in good faith, failed to affirmatively explore settlement in a timely manner, failed to evaluate and advise ICC of its liability and exposure in a timely manner, failed to indemnify when the obligation to pay became reasonable or clear, improperly threatened to void coverage, and "otherwise failed to properly and reasonably handle the claims against ICC in good faith." (Dkt. No. 39 at 8-9).

There is another matter currently pending in state court in which Lexington and Ms. Swanson are parties. In that case, Ms. Swanson is suing Lexington as the assignee of Haelen Health Systems, which is identified as ICC's "manager and administrator." A special master in the state court action has conducted an in camera review of the documents that Ms. Swanson is seeking through this motion. The state-court special master upheld Lexington's privilege assertions. However, that decision is not binding on this Court and the special master's analysis of privilege issues would be different in some respects than the analysis in this case because Ms. Swanson is suing in state court as an assignee of Haelen, rather than ICC.

The pending motion concerns Ms. Swanson's Request for Production (RFP) No. 1, which seeks production of "all claims related files and documents." Lexington has withheld production of a number of documents responsive to this RFP based on assertions of attorney-client privilege, work product protection, and/or relevance.

---

[1] In January 2006, Lexington removed an amended complaint that Ms. Swanson had filed against Lexington in state court. The removed action was consolidated with Lexington's earlier-filed action. In the consolidated action, Lexington is the plaintiff while Ms. Swanson is the defendant.

ORDER - 3

The parties have provided the Court with several different privilege logs regarding the withheld documents. Ms. Swanson has offered privilege logs that Lexington apparently provided in the state-court case in which Ms. Swanson is suing Lexington as an assignee of Haelen Health Systems. However, Lexington has also offered a revised 21-page privilege log dated December 4, 2006. The revised privilege log include assertions of "ICC/Lexington" privilege and "Lexington" privilege. Lexington's counsel explains the revised privilege log as follows:

> "ICC/Lexington" privilege indicates privileges attaching to communications or work product related to the defense of ICC in the underlying tort case. "Lexington" privilege indicates Lexington's attorney-client communications or work product related to coverage or "bad faith" issues and litigation.

(Neal Decl. at 2).

Lexington has not produced the withheld documents for *in camera* review. Ms. Swanson has not explicitly requested an *in camera* review, but has instead suggested that this motion can be resolved on the current record.

## Analysis

Because federal jurisdiction in this case is based on diversity, Washington law applies to claims of attorney client privilege, while federal law governs assertions of work product protection. See United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 965-66 (3d Cir. 1988); see also Fed. R. Evid. 501 and Fed. R. Civ. P. 26(b)(3).

1.    "ICC/Lexington" Privilege Assertions

The Court first considers whether Lexington may withhold documents responsive to RFP No. 1 based on assertions of what the insurer refers to as "ICC/Lexington" privilege. As noted above, Lexington has asserted "ICC/Lexington" privilege for "communications or work product related to the defense of ICC in the underlying tort case."

Lexington acknowledges that "it is undisputed that the insured's and the insurer's communications with the defense counsel, and any work product created in defense of the underlying

ORDER - 4

claim, may be discovered by the insured in a subsequent action." (Motion at 15).  In essence, Lexington does not dispute that if ICC were suing Lexington in this case, ICC would be entitled to receive documents for which "ICC/Lexington" privilege has been asserted.  Nonetheless, Lexington suggests that this case is "somewhat unusual" because "the insured (ICC) is not the party seeking the otherwise-privileged documents."  Id.

However, Ms. Swanson has purchased "[a]ll claims or causes of action, including but not limited to all rights, privileges, claims and causes of action that Defendant Issaquah Care Center, LLC may have against Lexington Insurance Company."  As a result, Ms. Swanson is standing in the shoes of ICC in prosecuting this action.

In support of her motion, Ms. Swanson points to Athridge v. Aetna Casualty and Surety Co., 184 F.R.D. 181 (D.D.C. 1998), a case in which a person injured in a car accident had been assigned the driver's cause of action against the driver's insurer.  In rejecting the insurer's efforts to withhold documents from the assignee of the insured's claims, the court noted:

> If one lawyer represents two persons or entities, neither can claim an attorney-client privilege when, having fallen out, one sues the other and demands to know what the other said to the lawyer when she was representing both of them.  This principle has been applied when an insurance company retains counsel who represents the insured.  When the insured then sues the insurance company, the courts have rebuffed that company's claiming attorney client privilege to prevent the insured's access to the documents created by counsel when she was representing the company's and the insured's common interest in defeating the case brought against the insured.  The latter principle has been applied with equal force when the insured assigns whatever claim she had to the person who sued her in the first place.  In that situation, the insurance company cannot claim an attorney-client privilege against the insured's assignee, any more than it could claim it against he insured.  In those cases, the courts have held that the insurance company could not claim a privilege against the insured or the insured's assignee.

Id. at 186-87 (internal citations omitted).  Other courts have reached similar conclusions in cases where an insured assigns its claims to another person or entity.  See, e.g., Simpson v. Motorists Mut. Ins. Co., 494 F.2d 850, 855 (7th Cir. 1974); see generally 1 Paul R. Rice, Attorney-Client Privilege in the United States § 4.29 (2006) (noting that courts have "held that the [attorney-client] privilege could

ORDER - 5

1  not be asserted against the assignee of a claim that the insured may have against the insurance

2  company relative to the matter about which there was joint representation" and collecting cases).

3        Lexington suggests that <u>Athridge</u> is distinguishable because ICC is a corporation, while the

4  insured in <u>Athridge</u> was not. Lexington cites several cases holding that where a corporation transfers

5  some but not all of its assets, the corporation's privileges do not automatically pass to the transferee.

6  However, Lexington does not cite any authority holding that this rule is applicable in cases where an

7  insured assigns its claims against an insurer to another person or entity. Indeed, while the <u>Athridge</u>

8  court noted that "cases involving other types of transfers of assets or claims have held that these

9  privileges are not transferred to the assignee," the court did not apply that rule in a case involving the

10  assignment of an insured's claim against an insurer. <u>Id.</u> at 187 n.4. In any case, it should be noted that

11  Ms. Swanson not only purchased all "claims" or "causes of action" that ICC may have against

12  Lexington, but also purchased ICC's "privileges."

13        Lexington also suggests that it may withhold documents based on "ICC/Lexington" privilege

14  because Lexington is in privity with ICC. To support this assertion, Lexington points to <u>Barry v.</u>

15  <u>USAA</u>, 98 Wn. App. 199 (1999), where the court noted:

16    Typically in the insured-insurer relationship, the attorney is engaged and paid by the carrier to
    defend the insured and therefore operates on behalf of the two clients. <u>Baker v. CNA Ins. Co.</u>,
17    123 F.R.D. 322, 326 (D. Mont. 1988). According to <u>Baker</u>, it is a well-established principle in
    bad faith actions brought by an insured against an insurer under the terms of an insurance
18    contract that communications between the insurer and the attorney are not privileged with
    respect to the insured. <u>See also</u> <u>Silva v. Fire Ins. Exch.</u>, 112 F.R.D. 699 (D. Mont. 1986),
19    cited in <u>Escalante</u>, 49 Wn. App. at 394, 743 P.2d 832. As explained in <u>Silva</u>, 112 F.R.D. at
    699-700, "The time-worn claims of work-product and attorney-client privilege cannot be
20    invoked to the insurance company's benefit where the only issue in the case is whether the
    company breached its duty of good faith in processing the insured's claim."

21  <u>Barry</u>, 98 Wn. App. at 204.

22        In essence, the court in <u>Barry</u> noted that attorneys who represent an insured may operate on

23  behalf of both the insured and the insurer. However, this point does not provide a basis for Lexington

24  to withhold production of documents based on an "ICC/Lexington" privilege. <u>Barry</u> stands for the

25

ORDER - 6

1  proposition that Lexington could not refuse to produce to ICC any communications with the attorneys
2  who operated on behalf of both Lexington and ICC in Ms. Swanson's underlying tort action against
3  ICC. Because Ms. Swanson has now stepped into the shoes of ICC, Lexington cannot refuse to
4  produce materials to Ms. Swanson that ICC would have been entitled to receive if it were prosecuting
5  claims against Lexington itself. See Athridge, 184 F.R.D. at 187 ("the insurance company cannot
6  claim an attorney-client privilege against the insured's assignee, any more than it could claim in against
7  the insured").

8  In sum, the Court finds that Lexington may not withhold documents from Ms. Swanson based
9  solely on an assertion of "ICC/Lexington" privilege. Therefore, the Court will require Lexington to
10 produce all documents that it has withheld solely on the basis of "ICC/Lexington" privilege. Such
11 documents shall be produced within seven (7) calendar days of the date of this order.

12 2.    Documents Containing "Reserve Information"

13 The second issue presented by this motion is whether Lexington may withhold production of
14 documents that contain "reserve information." In the revised privilege log dated December 4, 2006,
15 Lexington indicates that has withheld production of several documents containing reserve information
16 due to relevance objections.

17 Ms. Swanson argues that reserve information is relevant in bad faith disputes, citing Lipton v.
18 Superior Court of Los Angeles County, 48 Cal. App. 4th 1599 (1996). The Lipton court held that
19 reserve information was discoverable because such information would assist the plaintiff in evaluating
20 his bad faith case and in preparing it for trial. Id. at 1616. The Lipton decision is consistent with other
21 cases evaluating this issue. Indeed, one treatise has observed that "[t]o this writer's knowledge, no
22 case has held that reserves evidence is irrelevant in a bad faith case." Stephen S. Ashley, Bad Faith
23 Actions Liability & Damages § 10:31 (2006).

24 In response, Lexington asserts that "'reserve information' is work product," citing the Eighth
25 Circuit's decision in Simon v. G.D. Searle Co., 816 F.2d 397 (8th Cir. 1987). Lexington

ORDER - 7

1  oversimplifies this case. The Simon court held that "aggregate reserve information" was not protected

2  work product, but extended work product protection to "individual case reserves calculated by

3  [defendant's] attorneys." Id. at 401-02. Here, Lexington has not contended that the "reserve

4  information" represents "individual case reserves" calculated by its attorneys. In addition, no

5  attorneys are listed as the authors of any of the withheld documents containing "reserve information."

6  It should also be noted that Lexington's most recent privilege log does not assert work-

7  product protection for documents that contain "reserve information," but only raises relevance

8  objections. Washington courts have suggested that relevance is rarely a proper grounds in a bad faith

9  case for refusing to produce documents contained in the insurer's claims file. See, e.g., Escalante v.

10  Sentry Ins. Co., 49 Wn. App. 375, 393 n.10 (1987), disapproved of on other grounds by Ellwein v.

11  Hartford Accident & Indem. Co., 142 Wn.2d 766 (2001), (noting that "In general, the relevancy

12  objections raised by [the insurer] . . . are meritless because the very nature of most bad faith actions

13  makes most, if not all, of the insurer's claims file relevant.").

14  As a result, the Court will grant Ms. Swanson's request to require Lexington to produce all

15  documents withheld on the grounds that they contain "reserve information." Such documents must be

16  produced within seven (7) calendar days of the date of this order.

17  3.   "Lexington-Only" Privilege Assertions

18  Lexington has also withheld production of a number of documents based on what the parties

19  refer to as "Lexington-only" privilege. Lexington's counsel Christopher Neal states that these

20  documents "reflected Lexington's attorney client communications with me or with coverage counsel

21  Earl Sutherland, or were comprised of Lexington's work product regarding coverage or anticipated

22  'bad faith' claims." (Neal Decl. ¶ 6). Ms. Swanson presents several arguments for requiring

23  Lexington to produce documents for which "Lexington-only" privileges have been asserted.

24

25

ORDER - 8

A. <u>"Bad Faith Exception"</u>

First, Ms. Swanson suggests that she is entitled to production of all documents from the claims file under a "bad faith exception" to the attorney-client privilege. As discussed earlier, some courts have indicated that "it is a well-established principle in bad faith actions brought by an insured against an insurer under the terms of an insurance contract that communications between the insurer and the attorney are not privileged," because the attorney representing the insured is effectively operating on behalf of both the insured and the insurer. See <u>Barry</u>, 98 Wn. App. at 204.

However, Ms. Swanson does not cite any authority suggesting that an insured is automatically entitled to production of communications between an insurer and its separately-retained "coverage counsel" on matters related to the insurer's coverage obligations. Here, it appears that Lexington retained coverage counsel to provide legal advice regarding Lexington's coverage obligations under the policy. In such cases, the attorney-client privilege may be invoked to prevent disclosure of communications between the insurer and its separately-retained coverage counsel, since the coverage counsel is retained solely by the insurer and owes no duty of loyalty to the insured. See, e.g, <u>Tudor Ins. Co. v. McKenna Assocs.</u>, 2003 WL 21488058 at *3 (S.D.N.Y. June 25, 2003) (distinguishing obligations to produce documents involving counsel appointed to represent the insured from obligations to produce documents involving coverage counsel hired to advise the insurer).

Ms. Swanson does not point to any cases holding that attorney-client privilege is inapplicable to communications between an insurer and its coverage counsel. Ms. Swanson notes that in <u>Tyler v. Grange</u>, 3 Wn. App. 167, 174 (1970), the court stated that one factor that may be considered in assessing the "good faith posture of the insurer" is "the insurer's rejection of the advice of its own attorney or agent." Ms. Swanson also points to <u>Specialty Surplus Insurance Co. v. Second Chance, Inc.</u>, 412 F. Supp. 2d 1152 (W.D. Wash. 2006), in which Judge Coughenour of this Court observed that a treatise on Washington insurance law suggests that "[i]n resolving a case in which an insurer mixes coverage considerations with its evaluation of the tort claim, the trier of fact in a subsequent

ORDER - 9

bad-faith action must consider the reasonableness of both the insurer's coverage and tort assessments." Id. at 1166 (quoting Thomas V. Harris, Washington Insurance Law at 19-7). However, neither Tyler nor Second Chance addressed privilege issues, nor did either decision state that an insurer is precluded from invoking attorney-client privilege for communications between the insurer and its coverage counsel.

Ms. Swanson also cites Holmgren v. State Farm Mutual Automobile Insurance Co., 976 F.2d 573 (9th Cir. 1992). In Holmgren, the plaintiff brought an action under Montana law alleging bad faith in settling a claim. Citing work product production, State Farm withheld two documents drafted by its adjuster during the litigation of the underlying tort suit that contained a range of values for the plaintiff's claims. The Ninth Circuit indicated that "opinion work product may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling." Id. at 577 (emphasis in original). The court held both elements were met, noting: (1) "In a bad faith insurance claim settlement case, the strategy, mental impressions and opinion of [the insurer's] agents concerning the handling of the claim are directly at issue"; and (2) the plaintiff had demonstrated a compelling need for information regarding the insurer's opinion of the viability and value of the claim. Id. The court observed that "in bad faith settlement cases, insurers may call their adjusters to testify to their opinions as to the lack of viability of the underlying claim" and that "[w]hen an insurer chooses to remain mute on the subject, the plaintiff is not foreclosed from developing the same evidence." Id. at 578.

However, the Holmgren decision only addressed materials withheld under the work product doctrine, rather than documents withheld on the basis of attorney-client privilege. In its revised privilege log, it appears that Lexington has asserted "Lexington-only" work product protection for only several documents and that for some of those documents, Lexington has also asserted "Lexington-only" attorney-client privilege in addition to "Lexington-only" work product protection. As a result, Holmgren is of limited application to this case. Under Holmgren, an *in camera* review

ORDER - 10

may be appropriate to determine whether these documents include mental impressions regarding the viability or value of Ms. Swanson's tort claim. However, Ms. Swanson has not requested *in camera* review of the documents.

   B. <u>Waiver of Privilege</u>

  Ms. Swanson also suggests that all claims file documents are "discoverable because of Lexington's tortious bad faith and constructive fraud, as well as its asserted defenses." (Motion at 12). Ms. Swanson appears to argue that because this case involves allegations of bad faith by the insurer, Lexington has necessarily waived any privileges for the withheld documents.

  Washington courts have adopted a nuanced approach to the issue of privilege in "bad faith" insurance cases. In particular, Lexington points to <u>Escalante v. Sentry Insurance Co.</u>, 49 Wn. App. 375 (1987), <u>disapproved of on other grounds by</u> <u>Ellwein v. Hartford Accident & Indem. Co.</u>, 142 Wn.2d 766 (2001), where the court held:

> [A]ppellants argued . . . that an exception to the attorney-client privilege applies in bad faith litigation. That exception, which is referred to variously as the "fraud" or "civil fraud" exception, has been utilized in several insurance bad faith decisions outside of this jurisdiction, and is based on the recognition that attorney-client communications should not be protected when they pertain to ongoing or future fraudulent conduct by the insurer. The exception is usually invoked only upon a prima facie showing of bad faith tantamount to civil fraud. However, recognizing the proof problems inherent in requiring a prima facie showing at the discovery stage, the Supreme Court of Colorado held in <u>Caldwell v. District Court In and For City and Cy. of Denver</u>, 644 P.2d 26 (Colo. 1982) that the privilege may be overcome by a showing of a foundation in fact for the charge of civil fraud. The <u>Caldwell</u> court also held that the "foundation in fact" showing could be accomplished after an *in camera* inspection of the relevant documents. However, the *in camera* inspection would itself be a matter of trial court discretion requiring a factual showing "adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the . . . fraud exception . . . has occurred." We find this procedure to be a reasonable solution to the discovery problems associated with the attorney-client privilege in bad faith litigation. Therefore, we adopt the reasoning of the <u>Caldwell</u> court. . . .

<u>Escalante</u> at 393-94 (internal citations omitted).

  Under <u>Escalante</u>, Ms. Swanson must show a "foundation in fact for the charge of civil fraud." <u>Id.</u> at 394. To warrant an *in camera* review, Ms. Swanson must make a "factual showing 'adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the . . .

ORDER - 11

1  fraud exception . . . has occurred.'" Id. In the present CR 37 submission, Ms. Swanson has not made

2  a factual showing that wrongful conduct sufficient to invoke the fraud exception has occurred.

3  Indeed, Ms. Swanson has not even discussed the provisions of the Escalante decision. In essence, Ms.

4  Swanson appears to suggest that because she has alleged bad faith by Lexington, the fraud exception

5  applies. That is not consistent with the Escalante decision.

6  Ms. Swanson also suggests that because Lexington has waived its privileges for the withheld

7  documents because Lexington itself put its good faith at issue in this case. To support this argument,

8  Ms. Swanson cites Pappas v. Holloway, 114 Wn.2d 198 (1990), a legal malpractice case. In Pappas,

9  the court followed a three-part test to determine whether a party had waived attorney-client privilege:

10  (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting

11  party; (2) through this affirmative act, the asserting party put the protected information at issue by

12  making it relevant to the case; and (3) application of the privilege would deny the opposing party

13  access to information vital to his defense. Id. at 207.

14  Ms. Swanson argues that the first criteria is satisfied because Lexington took the affirmative

15  act of seeking a declaratory judgment that it "did not commit any act of 'bad faith" claims handling (or

16  allegedly related acts) in the administration of the claim." While Ms. Swanson may be correct on this

17  point, she has done little to show that the other two criteria are met. For the second criteria, she

18  simply states that "the claims file is relevant both to bad faith claims as well as the coverage issues

19  raised by Lexington," with little explanation. (Motion at 14). On the third criteria, she asserts that "to

20  block discovery would deny Swanson an adequate defense," arguing that "bad faith actions, like

21  malpractice actions, 'involve examining decisions made at various stages of the underlying litigation'

22  and 'necessarily involve information communicated between these [third party] attorneys" and others.

23  Id. (quoting Pappas). However, it is not clear how the documents for which "Lexington-only"

24  privilege have been asserted would be necessary to Ms. Swanson's defense.

25  C. Commingling of Claims Handling and Coverage Decision Documents in Claims File

ORDER - 12

1    It appears that the claims file in this case includes documents related to Lexington's coverage

2   decision. Ms. Swanson states that "all the alleged 'protected' information was commingled into one

3   claims file, including the separate and independent coverage evaluations, rendering them at issue and

4   discoverable." (Motion at 11). To support this assertion, Ms. Swanson cites Specialty Surplus

5   Insurance Co. v. Second Chance, Inc., 412 F. Supp.2d 1152, 1166 (W.D. Wash. 2006). However, the

6   Second Chance decision did not address privilege assertions, nor did it state that all documents

7   commingled into a claims file are discoverable.

8    Ms. Swanson also suggests that the documents in the claims file have not been kept

9   confidential from ICC, resulting in the waiver of any "Lexington-only" privileges. To rebut this

10  contention, Lexington has offered a declaration from Sharon Sobers of AIG Domestic Claims, the

11  company that administers claims for Lexington, in which she asserts that documents for which

12  Lexington is asserting privilege or work product protection have been kept confidential from ICC.

13   However, Ms. Swanson notes that in an earlier pleading filed in this case, Lexington stated that

14  Ms. Sobers served as "ICC's agent." Specifically, Lexington asserted that "[a]s ICC's agent, Sharon

15  Sobers' communications with ICC's defense counsel regarding ICC's defense were privileged." (Dkt.

16  No. 63 at 12). Ms. Swanson appears to maintain that the claims file was not kept confidential from

17  ICC because Ms. Sobers was ICC's "agent" and had access to the file. In response, Lexington asserts

18  that "the claim handlers' privity to both the defense of ICC and coverage advice does not destroy

19  either privilege," but offers no case law to support this assertion.

20   Although neither side has provided compelling legal authority for their positions on this issue,

21  the Court finds Lexington's argument more persuasive. Ms. Sobers was employed as a claims handler

22  by Lexington. In essence, Lexington and its employees had a dual role: (1) they acted on behalf of

23  ICC in providing a defense to the underlying tort claim against ICC; and (2) they acted on behalf of

24  Lexington in retaining coverage counsel to ascertain Lexington's coverage obligations. As noted

25  earlier, Lexington may assert attorney-client privilege for its communications with coverage counsel.

ORDER - 13

Ms. Swanson provides no authority indicating that this privilege may be defeated because the same Lexington employee acted in the "dual roles" served by the company as a whole. Ms. Swanson cites no case law suggesting that an insurer must have different employees interact with "coverage counsel" and counsel in the underlying tort action in order to preserve its privileges.

### D.   Evidentiary Support for Privilege Assertions

Ms. Swanson also suggests that Lexington has not offered sufficient evidence to support its privilege assertions. As the party asserting privilege, Lexington bears the burden of demonstrating that the attorney-client privilege or work product protection apply. See Dietz v. Doe, 131 Wn.2d 835, 844 (1997) (attorney-client privilege); Heath v. F/V Zolotoi, 221 F.R.D. 545, 549 (W.D. Wash. 2004) (work product protection). Lexington has produced a privilege log, along with declarations from Christopher Neal (identified as Lexington's "coverage counsel") and Sharon Sobers of AIG Domestic Claims. As Lexington notes, such an approach may be used to make a prima facie showing of privilege. See In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992).

Ms. Swanson raises several challenges to the privilege assertions. First, she observes that Lexington has asserted privilege for a number of "claims notes" authored by Sharon Sobers and Blair Winston of AIG Domestic Claims. Ms. Swanson argues that there is no evidence that Ms. Sobers or Ms. Winston are attorneys or that they are employed by Lexington. Second, Ms. Swanson asserts that there is no foundation regarding who the "clients" were for the various attorneys identified in the privilege log. Third, Ms. Swanson suggests that attorney Christopher Neal of the law firm of Cozen O'Connor, who authored or received many of the documents, may have been serving as a "negotiator" or "claims adjuster," rather than an attorney providing legal advice, and "many of the entries describing the withheld documents are simply based upon 'evaluations' of depositions or settlement and other unprotected claims adjusting functions." (Motion at 11).

In response, Lexington complains that Ms. Swanson did not raise concerns at the parties' Rule 37 conference about a lack of evidentiary support for Lexington's privilege assertions. Lexington has

ORDER - 14

therefore moved to strike these objections by Ms. Swanson. However, Lexington has also offered declarations from Ms. Sobers and Mr. Neal that seek to address Ms. Swanson's arguments.

Ms. Sobers states that she is a Complex Claims Director with AIG Domestic Claims, the claims handling agency for Lexington. She indicates that AIG "administers all of Lexington's claims related business, and also obtains any needed legal advice for Lexington on coverage issues." She states that Blair Winston of AIG retained Mr. Neal, as well as Earl Sutherland of Reed McClure, "to provide legal advice on specific policy coverage questions." She states that AIG communicated information to Mr. Neal for the purpose of obtaining legal advice, that Mr. Neal communicated with her to provide legal advice, and that the communications were confidential. She indicates that she "also made claims notes regarding Mr. Neal's legal advice and our conversations," which "are designated in the Log as Claims Notes authored by me that contain or are completely comprised of attorney client communications." She states that Ms. Winston of AIG engaged in similar communications with Mr. Neal and/or Mr. Sutherland and made similar claims notes recording Mr. Sutherland and/or Mr. Neal's legal advice. Ms. Sobers also asserts that "if ICC had requested copies of documents related to its insurance claims, documents reflecting legal advice to Lexington, or my communications with coverage counsel, would not have been provided to ICC." She also states that neither ICC or any other unnecessary third party were provided with any documents reflecting attorney-client communications or Lexington's work product.

In his declaration, Mr. Neal states that he and Ms. Sobers and Ms. Winston communicated in writing and verbally regarding his legal advice regarding coverage for the ICC claim. He states that all such communications were in confidence and for the purpose of providing legal advice. He states that he "was not retained to, and did not provide any, claims handling services or advice, but rather provided only legal advice."

The declarations from Ms. Sobers and Mr. Neal provide a foundation to support the "Lexington-only" privilege assertions in the December 4, 2006 privilege log. As a result, short of

ORDER - 15

conducting an *in camera* review of the documents for which "Lexington-only" privilege has been asserted, the Court cannot find that privilege has been improperly asserted for these documents.[2]

In short, the Court cannot determine whether "Lexington-only" privilege has been properly asserted without an *in camera* review of the documents. Indeed, the Washington Court of Appeals has suggested that such a review is required in order to determine whether a privilege is properly asserted. See, e.g., Versuslaw, Inc. v. Stoel Rives, LLP, 127 Wn. App. 309, 331 (2005) ("[w]hen disclosure of evidence is opposed on the basis of privilege, an in camera review is the only way a court can determine whether a document is exempt from disclosure."). However, Ms. Swanson has not requested an *in camera* review of the documents, but has instead suggested that this submission may be decided without an *in camera* review.

Therefore, the Court will deny Ms. Swanson's request to compel production of documents for which "Lexington-only" privilege has been asserted, without prejudice to Ms. Swanson's ability to file a renewed motion to request an *in camera* review of these documents. If Ms. Swanson wishes to request an *in camera* review of these documents, however, the parties must meet and confer to attempt to narrow or resolve the dispute without the Court's intervention. Any renewed motion must be filed as a joint submission pursuant to CR 37.

---

[2] The Court notes that Plaintiff filed a "supplemental declaration" by counsel David Beninger that presents additional arguments contesting Lexington's assertions of privilege for documents received or authored by attorney Earl Sutherland of the law firm Reed McClure. Raising arguments that were not presented in the briefing, Mr. Beninger asserts in his supplemental declaration that Mr. Sutherland served as "monitoring counsel" for Lexington and that his communications are not privileged. Mr. Beninger includes legal citations in his supplemental declaration to support these arguments. The parties are advised that the Court will not consider legal arguments made in a declaration. See King County v. Rasmussen, 299 F.3d 1077, 1082 (9th Cir. 2002). If Ms. Swanson wishes to raise the arguments made in Mr. Beninger's supplemental declaration, she must do so by filing a motion after meeting and conferring with opposing counsel.

ORDER - 16

**Conclusion**

Consistent with the discussion above, the Court grants in part and denies in part Ms. Swanson's motion to compel Lexington to produce documents responsive to RFP No. 1. The Court:

(1) GRANTS the motion to the extent Ms. Swanson seeks documents withheld by Lexington solely on the basis of a so-called "ICC/Lexington" privilege assertion. Lexington shall produce such documents to Ms. Swanson within <u>seven (7) calendar days</u> of the date of this order.

(2) GRANTS the motion to the extent Ms. Swanson seeks documents that have been withheld on the grounds that they contain "reserve information." Lexington shall produce such documents to Ms. Swanson within <u>seven (7) calendar days</u> of the date of this order.

(3) DENIES Ms. Swanson's request to compel production of documents withheld by Lexington on the basis of "Lexington-only" privilege assertions, without prejudice to Ms. Swanson's ability to file a renewed motion to request an *in camera* review of these documents. Before any renewed motion is filed, however, the parties must first meet and confer to attempt to narrow or resolve the dispute without the Court's intervention. Any renewed motion must be filed as a joint submission pursuant to CR 37.

The Clerk is directed to send copies of this order to all counsel of record.

Dated:   February 12, 2007

s/Marsha J. Pechman
Marsha J. Pechman
United States District Judge

ORDER - 17