UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEXINGTON INSURANCE CO.,

         Plaintiff,

v.

SANDRA SWANSON,

         Defendant.

No. C05-1614MJP

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Swanson's motion for partial summary judgment. (Dkt. No. 100.) Defendant Sandra Swanson as assignee of Issaquah Care Center ("ICC") has moved for partial summary judgment seeking to dismiss Plaintiff Lexington Insurance Company's ("Lexington") affirmative defenses to Swanson's counterclaims in this insurance coverage case. Having considered Defendant's motion, Plaintiff's response (Dkt. No. 129), Defendant's reply (Dkt. No. 140), Plaintiff's surreply (Dkt. No. 144), all documents submitted in support thereof, and the record herein, the Court GRANTS IN PART and DENIES IN PART Swanson's motion for partial summary judgment.

**Background**

Defendant Swanson filed a personal injury action against ICC on March 21, 2003, for claims arising out of the negligent care she received during her stay at a ICC's nursing home. (Beninger Decl., Ex. 1.) ICC tendered defense of the lawsuit to Lexington on April 17, 2003. (See id. at Ex. 2,

ORDER - 1

18.) In early June, Swanson made an offer to settle the case for the policy limits.[1] (Id. at Ex. 3; Sobers Decl. Ex. 2.) Bradley Reager, Lexington's claims analyst, concluded that the case could potentially create liability for ICC in excess of Lexington's policy limits and suggested that ICC retain independent counsel. (Beninger Decl., Ex. 5.) Diane Libby, counsel hired to represent ICC, also agreed that the case involved a possible likelihood of liability. (Beninger Decl., Ex. 7, at 6.) However, Lexington did not agree to settle because Reager and Libby concluded that they needed to evaluate Swanson's claims further before making any settlement decisions. (Id., Ex. 7.)

The Lexington policy issued to ICC had a $1 million per incident limit with a maximum coverage of $3 million. (Id., Ex. 4.) The policy also contained endorsements, including a "spend-down" clause, which placed a cap on the total funds available to pay out any claims. (Id., Ex. 4.) The clause operated by including Lexington's defense expenses in the policy limits, so that every dollar spent on defending the action reduced the amount available to ICC to pay any future settlement or judgment. (Id.) Another endorsement was a $100,000.00 self-insured retention provision. (Id.)

In September 2003, Swanson brought additional claims against Haelen Health Systems ("Haelen"), the administrator of ICC's nursing home. (Id., Ex. 8.) Haelen filed cross-claims against ICC for indemnification. (Sobers Decl., Ex. 6, at 22-24.) ICC retained Mary Nester as independent counsel to handle the Haelen cross-claim. (Beninger Decl., Ex. 9.) Although Nester did not represent ICC for Swanson's underlying claim, she had access to the available discovery materials, and on April 7, 2004, Nester wrote a letter to Scott Barbara, another attorney retained by Lexington to represent ICC against Swanson, requesting a policy limit settlement offer. (Id., Ex. 9.) Around that time, Barbara and Reager reached the same conclusion. (Id., Ex. 10.) They determined that the probable net exposure for ICC was in the range of $1.82 million to $3.36 million. (Id. at 10.) In a May 31, 2004, litigation plan, Barbara wrote, "[w]e now have sufficient information based upon the records reviewed to recommend the full limits of ICC's policy be made available to settle this case." (Id.)

---

[1] Although Lexington disputes that the letter sent by Swanson on June 3, 2003, was an offer to settle the case, a second letter sent by Swanson later that month confirmed that it was an offer, (Beninger Decl., Ex. 3) and ICC's attorneys considered it a settlement offer. (Sobers Decl., Ex. 2.)

ORDER - 2

Because Reager had been replaced by another claims adjuster between the time he met with Barbara and the drafting of the litigation plan, Barbara sent the plan to Reager's replacement, Blair Winston, for review. (Id.)

On May 17, 2004, Swanson scheduled a mediation between the parties for June 1, 2004. (Neal Decl., Ex. 4.) The following day, Libby notified Swanson that ICC would be unavailable on that date, and requested that the mediation be rescheduled. (Id.) Nevertheless, the June 1 mediation went forward and Barbara attended the mediation on behalf of ICC. (Beninger Decl., Ex. 11.) Swanson reiterated the policy limits settlement offer at that mediation. (Neal Decl., Ex. 1, at 26-27.) Although Barbara had recommended that Lexington settle the case for policy limits, the parties did not resolve the case at the mediation. (Neal Decl., Ex. 1, at 27.) In July 2004, the new claims adjuster, Winston, indicated that although Swanson had made a policy limits demand, the "policy has not yet been triggered since the [self-insured retention] has neither been tendered nor exhausted." (Beninger Decl., at Ex. 12.)

On July 21, 2004, Nester again wrote to Libby requesting a policy limits settlement. (Id., Ex. 13.) The following month, Libby wrote to Swanson, indicating that prior to any settlement Swanson must first provide expert reports and opinions supporting her claims. (Neal Decl., Ex. 8.) In September, Barbara wrote to Swanson, indicated that ICC had received some evidence from Swanson's expert witnesses, and announced that ICC had been authorized to settle the case for the full policy limits of $1 million. (Neal Decl., Ex. 7, at 2.) The offer was extended in writing in advance of a mediation scheduled to take place in mid-October. (Neal Decl., Ex. 1, at 28.) At the mediation, Swanson declined to settle for $1 million less litigation expenses, and for the first time argued that the maximum $3 million "should be in play" because each of her injuries were separate incidents. (Id. at 30.) The parties failed to reach an accord. (Id.)

Following the mediation, Lexington retained coverage counsel to determine whether ICC was entitled to coverage for the maximum amount of the policy. (Beninger Decl., Ex. 17, at 3.) They concluded that the facts supported single incident coverage only, and orally informed Barbara and

ORDER - 3

Libby that the policy limit was $1 million. (Id.) On approximately June 20, 2005, counsel for the various defendants met and advised Lexington that full exposure in the case was likely between $4 million and $6 million. (Id.) On June 21, 2005, Lexington's coverage counsel provided a letter confirming their opinion that the facts supported single incident coverage only, and reserved all rights. (Id.; Beninger Decl., Ex. 15) At the mediation, Swanson again refused to settle for the single incident policy limits of $1 million. (Beninger Decl., Ex. 17, at 3.)

In August 2005, Swanson and ICC agreed to arbitrate their dispute. (Id.) On August 19, Lexington sent a letter to Barbara in which it did not object to the arbitration, but reserved its right not to be bound by the outcome of the arbitration proceeding. (Id., Ex. 16, at 2.) Lexington also reserved the right to contest coverage in the event ICC entered into a settlement agreement without Lexington's consent, or assigned its interests against Lexington. (Id.) At the arbitration, Swanson was awarded damages of $6 million. (Id., Ex. 17, at 6.) Lexington did not pay the full judgment, but in December 2005, forwarded payment of $580,000.00 to Swanson, labeling the check "Full and Final Payment." (Neal Decl., Ex. 10.) Swanson returned the check and requested a new check without the additional language. (Beninger Decl., Ex. 19.) Shortly thereafter, Lexington issued a new check without the additional language. (Id. at 2.)

The present case has a tortured procedural history. The relevant proceedings began when Swanson sought to enforce the arbitration award against ICC in Washington State superior court. See Swanson v. Issaquah Care Center, LLC, No. 03-2-20442-1SEA. Thereafter, when Swanson amended her complaint to include Lexington as a defendant, Lexington removed the case to federal court. (CV06-005 RSL, Dkt. Nos. 1-3.) Prior to removal of Swanson's state court action, Swanson purchased ICC's choses in action against Lexington at a Sheriff's sale of ICC's assets. (Id., Dkt. No. 2, Ex. 3.) Swanson then amended her complaint to include claims against Lexington as ICC's assignee. (Id., Ex. 8.) On January 11, 2006, Lexington filed an answer to Swanson's complaint, raising several affirmative defenses. (Id., Dkt. No. 5.)

ORDER - 4

At the same time, the present lawsuit filed by Lexington was pending before this Court. (Dkt. No. 1.) Lexington filed this suit against ICC seeking, among other things, a declaratory finding that ICC was entitled to single incident coverage only. (Id.) The Court consolidated the two federal cases on Lexington's motion, terminated the removed case, and ordered Swanson to file an answer to Lexington's complaint with any counterclaims within sixty days. (Dkt. Nos. 33-34.) On May 17, 2006, Swanson filed an answer with counterclaims that were nearly identical to the claims she raised in the complaint terminated by the motion to consolidate. (Dkt. No. 39.) Finally, on October 24, 2006, Lexington filed an answer to Swanson's counterclaims. (Dkt. No. 73.) With one exception, each of the nineteen affirmative defenses raised in Lexington's answer were raised in Lexington's answer to Swanson's original complaint.

Swanson now moves to dismiss Lexington's affirmative defenses to Swanson's counterclaims. Swanson has also moved to strike material contained in Lexington's response. Lexington opposes Swanson's motion and has moved to strike material contained in Swanson's reply. Lexington also requests a rule 56(f) continuance on any claims made by Swanson relating to ICC's defense of cross-claims filed by Haelen in the previous state court action.

## Discussion

### I.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an

absence of evidence to support the nonmoving party's case. <u>Catrett</u>, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 (1986).

## II.     Rule 56(f) Continuance

Lexington has requested a continuance pursuant to Fed. R. Civ. P. 56(f), arguing that Swanson is attempting to plead a new claim through her summary judgment briefing. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). Lexington argues that Swanson is attempting to assert a claim for coverage of the costs incurred by ICC defending the cross-claim made by Haelen in the state court proceeding. Lexington seeks a continuance so that it may perform further discovery on this issue before the Court issues a ruling. But none of the affirmative defenses that Swanson is seeking to dismiss from Lexington's answer relate to the Haelen cross-claim and Lexington does not explain how further discovery would help it respond to this motion. Because Swanson is not seeking summary judgment on any issues related to the Haelen cross-claim, the Court DENIES Lexington's request for a Rule 56(f) continuance.

## III.    Affirmative Defenses

Swanson has moved for summary judgment dismissal of all of Lexington's affirmative defenses. Swanson challenges all of the affirmative defenses on timeliness grounds. In the alternative, Swanson raises specific challenges to individual affirmative defenses.

### A.     Timeliness

Relying on Fed. R. Civ. P. 16(b), Swanson argues that Lexington's affirmative defenses should be dismissed as untimely because Lexington did not file an answer to Swanson's counterclaims

ORDER - 6

until three months after the Court-ordered deadline for amending the pleadings. But Lexington filed a responsive pleading, not an amended pleading. Because the Court did not set a Rule 16(b) deadline for responsive pleadings, Lexington's answer was not untimely under Rule 16(b).

Swanson also argues that the Court should dismiss all of Lexington's affirmative defenses because Lexington filed its answer more than twenty days after the deadline for responsive pleadings in violation of Fed. R. Civ. P. 12(a)(2). But absent a showing of prejudice, a defendant may raise an affirmative defense for the first time at summary judgment. Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993); see also Draper v. Coombs, 792 F.2d 915, 924-25 (9th Cir. 1986) (affirming denial of default judgment because plaintiff did not show that defendant's failure to file timely answer in compliance with federal rules resulted in any prejudice). Here, Swanson has made no showing of prejudice resulting from Lexington's late filing of the answer. Moreover, when a plaintiff receives notice of an affirmative defense by some means other than the pleadings, the defendant's failure to comply with the pleading requirements of Fed. R. Civ. P. 8(c) does not cause the plaintiff any prejudice. Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993) (citing Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989)). Swanson had notice of Lexington's affirmative defenses because prior to the consolidation of the actions, Lexington filed an answer to Swanson's complaint that included all but one of the affirmative defenses raised in the second answer.[2] (CV06-005 RSL, Dkt. No. 5.) In addition, some of the defenses raised by Lexington are identical or substantially related to Lexington's affirmative claims for relief in the declaratory judgment action. (See Dkt. No. 14.) As a result, Swanson was aware, or should have been aware, that Lexington would rely on these defenses. If Swanson believed that she did not have sufficient notice of Lexington's intended defenses, she could have filed a motion for default or objected in October 2006 when Lexington filed its late answer. Because Swanson has not shown any prejudice, the Court denies Swanson's motion as it pertains to the timeliness of Lexington's answer.

---

[2] Lexington admits that Affirmative Defense No. 18 is not an affirmative defense, but a reservation of the right to seek attorney's fees at the conclusion of the suit. This is a post-judgment remedy which need not be addressed by the Court at this time.

ORDER - 7

### B.     Challenges to Affirmatively-Plead Contract Defenses to Coverage

Lexington has alleged ten affirmative defenses that are contract defenses to coverage. (Dkt. No. 73, Affirmative Defenses Nos. 1-4, 9-13, 15.) Swanson contends that these ten contract defenses to coverage are barred under Washington law because Lexington failed to reserve its right to raise those defenses. Unless an insurer notifies the insured that it intends to contest coverage, the insurer's continued control of the defense constitutes a waiver of the right to challenge coverage at a later date. Van Dyke v. White, 55 Wn.2d 601, 607-08, 349 P.2d 430 (1960). Such notification is known as a "reservation of rights." See Truck Ins. Exch. v. Vanport Homes, Inc., 147 Wn.2d 751, 761, 58 P.3d 276 (2002). But absent evidence of prejudice or bad faith, the insurer is not estopped from raising coverage defenses merely because it failed to notify the insured of all coverage defenses. See Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 63, 1 P.3d 1167 (2000).

As an initial matter, Lexington concedes in its briefing that many of the defenses plead as "affirmative defenses" are not truly affirmative defenses.[3] (Plf.'s Resp. at 19-20.) Swanson does not dispute this concession. Thus, the Court addresses these defenses, not as affirmative defenses for which Lexington would bear the ultimate burden at trial, but as defenses to Swanson's counterclaims, for which Swanson bears the burden of proof at trial.

Lexington disputes Swanson's interpretation of Washington reservation of rights law in two respects. First, Lexington argues that Swanson did not allege that she had suffered any prejudice as a result of Lexington's failure to reserve its rights earlier. Second, Lexington argues that it need not issue a reservation of rights to protect its right to assert defenses related to policy limits or conditions precedent to coverage. This latter argument relates to Affirmative Defenses Nos. 2 and 4, which the Court will address separately.

---

[3]     Lexington concedes that the following defenses are not true affirmative defenses: Affirmative Defenses Nos. 1-6, 9-15, 17. These include all of Lexington's contract defenses to coverage.

ORDER - 8

### 1. Evidence of Prejudice

Lexington argues that because Swanson failed to allege any prejudice, Lexington should not be estopped from raising these coverage defenses. Swanson argues that she was prejudiced by Lexington's management of ICC's defense. Lexington has moved to strike Swanson's arguments and evidence regarding prejudice because Swanson presented them for the first time in her reply brief. Lexington also challenges Swanson's prejudice arguments on their merits, claiming that it did not control the litigation and that Swanson was not prejudiced.

### a. Motion to Strike

Lexington argues that several pages of argument and evidence in Swanson's reply motion relating to waiver of coverage defenses should be excluded because those pages contain extensive new argument and case authority. "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996). Here it is unnecessary to strike a portion of the reply. The argument and authority raised by Swanson in her reply relate to prejudice resulting from Lexington's control of the defense. Swanson addressed the issues of prejudice and control of the defense in her original motion for summary judgment. (Mot. at 10.) In addition, Swanson has offered the evidence relating to prejudice to reply to arguments in Lexington's response. (See Resp. at 20-21.) Because the at-issue arguments and evidence reply to arguments made in the response brief, and do not involve an entirely new argument raised for the first time by Swanson in her reply, the Court denies Lexington's motion to strike.

### b. Control of Litigation

Swanson argues that ICC was prejudiced by the fact that Lexington controlled the ICC–Swanson litigation for nearly two years before issuing a reservation of rights. In Washington, courts presume that the insured has been prejudiced when the insurer has defended without a reservation for ten months or more. Transamerica Ins. Group v. Chubb & Son, Inc., 16 Wn. App. 247, 252, 554 P.2d 1080 (1976); see also Safeco Ins. Co. v. Butler, 118 Wn.2d 383, 389, 823 P.2d

ORDER - 9

499 (1992). In its responsive brief, Lexington does not dispute that it controlled ICC's defense from approximately April 2003 through June 2005.[4] Lexington also does not dispute that it did not issue a reservation of rights until June 2005.[5] But at oral argument, counsel for Lexington argued that Lexington did not control ICC's defense during this period. Counsel argued that the insured, ICC, hired Michael Orber & Associates to manage its defense, and that Mr. Orber hired attorneys Libby and Barbara from the Johnson, Christie, Andrews law firm as ICC's defense counsel.

Lexington's assertion at oral argument that it did not control ICC's defense is not itself evidence that Lexington did not control the defense. Moreover, the assertion is contradicted by evidence that both parties proffered throughout this case. For example, in support of a separate motion for summary judgment, Lexington offered the declaration of Robin DuBrin, the managing member of ICC. In that declaration, Dubrin stated:

1. "It is my opinion that Lexington Insurance Company's retained defense counsel, Johnson, Christie, Andrews and Skinner, capably defended Issaquah Care Center, LLC against Mrs. Swanson's claims." (DuBrin Decl. ¶ 3.)

2. "ICC was provided a full defense to the underlying suit brought by Swanson by Lexington Insurance Company." (Id. ¶ 20.)

In addition, in support of its opposition to the present motion for summary judgment, Lexington offered the Declaration of Earl Sutherland, an attorney retained by Lexington to oversee the Swanson-ICC lawsuit. Sutherland points to a letter he wrote to ICC's corporate counsel, Mary Nester, in August 2004, in which he stated:

> Lexington is cognizant of its duties to your client. Lexington will thoroughly investigate all liability and damages issues involved in the claim. It has retained competent defense counsel. The company, as well as the Johnson Christie law firm, and its lawyers, recognize that only Issaquah Care Center is their client. From what

---

[4] Lexington does dispute that it controlled ICC's defense of the Haelen cross-claim, but that dispute is irrelevant to Swanson's challenge of Lexington's affirmative defenses.

[5] Lexington does argue that it reserved its rights regarding policy limits in 2004. (See Plf.'s Resp. at 6; Sutherland Decl., Ex. 1.) That argument is addressed in Section III.B.2 below. Lexington also argues that it informed ICC of the $100,000.00 SIR. Lexington points to a letter from Lexington attorney Earl Sutherland in August 2004, more than sixteen months after Lexington assumed control of ICC's defense, in which Sutherland informs ICC corporate counsel Mary Nester of the SIR. (Sutherland Decl., Ex. 1.)

ORDER - 10

> we have seen, the law firm has kept Issaquah Care Center fully informed of the progress of the lawsuit.
>
> Lexington will continue to diligently investigate and evaluate the claims in this case. . . . Under the Lexington Insurance Company policy no. 6790096, however, your client has a contractual obligation to pay the first $100,000.00 in indemnity and/or defense costs.

(Sutherland Decl., Ex. 1.) Moreover, in September 2005, Scott Barbara sent Chris Neal, counsel for Lexington, a letter in which he stated as follows: "Our office was retained by AIG to represent the best interests of its insured, ICC, LLC."[6] (Beninger Decl., Ex. 18.) And in his March 20, 2007, deposition, Barbara had the following exchange with Swanson's attorney:

> Q: When you do, though, talk about Lexington stepping down at some point in time to begin payment, Lexington had always been involved from the beginning of the claim, as you understand, under the litigation-management program to coordinate and be involved in the defense and evaluation of the claims, correct?
> A: Yes.
> Q: Were you ever told that Lexington didn't feel its defense obligations or its necessity of being involved in developing the agreed-to litigation plans weren't triggered until ICC first paid $100,000?
> A: I don't recall ever being told that. And prior to my time, I don't recall there being any documents in the file to that effect.
> Q: The actions of Lexington/AIG from the inception of the case was one, though, of not waiting to be triggered, but to be actively involved in the control and planning of the defense in accordance with the litigation-management program, correct?
> A: We were communicating and coordinating with the claims professionals throughout, from the inception.

(Supp. Beninger Decl., Ex. A, Barbara Dep. at 97-98.) This evidence belies Lexington's assertion at oral argument that it did not control ICC's defense during the period from April 2003, when Swanson brought her initial suit against ICC, through June 2005, when Lexington issued its reservation of rights.

Swanson also argues that she was prejudiced because Lexington retained control over ICC's defense despite several conflicts of interest. In support of her argument, Swanson cites four examples of Lexington's conflicts, including (1) the use of litigation management plans requiring pre-approval of all decisions made by ICC's defense counsel, including the decision to settle the case, by

---

[6] AIG is the claims handling agency for Lexington Insurance Company. (Dkt. No. 53, Sobers Decl. ¶ 1.)

ORDER - 11

Lexington's insurance adjusters; (2) the spend-down provision of ICC's policy with Lexington; (3) the policy's self-insured retention provision; and (4) Lexington's rejection of multiple policy limits settlement opportunities. (Reply at 8-9.)

Litigation management plans create a potential conflict because they permit an insurer to wield a veto over settlement decisions despite the recommendation of the insured's counsel. In this case, at least once, Lexington refused to settle for policy limits despite ICC counsel's recommendation. (See Beninger Decl., Ex. 10-12.) In addition, spend-down policies create a potential conflict of interest. "Insurers can be placed in potential or real conflict situations under a [spend-down] policy when they attempt to control the insured's defense." Baldwin, Legal and Ethical Considerations for "Defense within Limits" Policies, 61 Def. Counsel J. 89 (1994). The conflict arises because although the insured may wish to settle to avoid any excess liability, the insurer has an interest in defending the suit to avoid liability entirely. In the event the insurer should lose, it has the same liability as if it had paid a policy limits settlement offer.

Lexington's control of the litigation defense for nearly two years before issuing a reservation of rights raises a presumption that its insured was prejudiced. See Transamerica, 16 Wn. App. at 252. Lexington has not rebutted this presumption. It has offered no evidence suggesting that ICC was not harmed by its failure to issue a timely reservation of rights. And Swanson, on behalf of ICC, has offered evidence that ICC was prejudiced not only by the late reservation, but also by conflicts of interest created by Lexington's method of controlling the litigation. Thus, because Lexington did not issue a reservation of rights until after it had controlled the defense for almost two years, because Lexington has presented no evidence rebutting the presumption of prejudice, and because ICC has presented evidence indicating that it was prejudiced, Lexington has waived eight of its contract defenses to coverage, Affirmative Defenses Nos. 1, 3, 9-13, and 15. Those affirmative defenses are therefore dismissed. Lexington may not rely on those defenses as affirmative defenses or as legal defenses to Swanson's bad faith, negligence, or other counterclaims.

### 2. No Reservation Necessary to Assert Policy Limits, but Necessary to Assert Conditions Precedent to Coverage

Lexington argues that it did not need to reserve rights with respect to its policy limit or conditions precedent to coverage defenses.[7] An insurer need not issue a reservation of rights letter to its insured in order to limit its risk to the policy limit. See Thomas V. Harris, Washington Ins. Law § 17.1 (2d ed. 2006) ("By providing its insured with policy limit information, an insurer is attempting to protect itself against a bad faith claim rather than protecting its right to deny that the policy applies to the claim.") In the present case, Lexington does not claim that ICC is not entitled to coverage. Indeed, Lexington has already paid Swanson the amounts remaining under the $1 million single-incident policy limit.[8] Instead, Lexington is merely disputing the applicable policy limit. Because Lexington did not need to reserve its rights with respect to the applicable policy limit, the Court will not dismiss Affirmative Defense No. 4.

Lexington also argues that it need not reserve rights with respect to the policy's conditions precedent to coverage. In so arguing, Lexington relies on an insurance treatise for the proposition that conditions precedent to coverage are not waived when the insurer has failed to defend. 14 Lee R. Russ et al., Couch on Insurance, ¶ 202.13 (2005). But in the present case, Lexington assumed defense of the claim. In so doing, without issuing a reservation of rights as to conditions precedent to coverage, Lexington failed to preserve the right to contest coverage at a later date. See Van Dyke, 55 Wn.2d at 607-08. For the same reasons discussed in section III.B.1.b above, the Court dismisses Affirmative Defense No. 2.

---

[7] These are Affirmative Defense Nos. 4 and 2, respectively.

[8] In support of its argument regarding policy limits, Lexington submitted a declaration with attached exhibits from Earl Sutherland, a Lexington attorney. (Dkt. No. 131.) Swanson moved to strike that testimony and evidence, arguing that Lexington should be barred from using this information as evidence where Lexington previously refused to disclose information relating to advice or communications from Sutherland. Because the Court does not rely on the Sutherland declaration in resolving this issue, the motion to strike is moot. And even if the motion were not moot, it would be denied because (a) Swanson failed to cite where Lexington previously asserted this privilege; and (b) in fact, Lexington never asserted privilege as to these particular documents.

ORDER - 13

**C.   Challenges to Miscellaneous Affirmative Defenses**

**1.   Affirmative Defense No. 7 — Waiver/Estoppel/Laches**

Lexington's seventh affirmative defense states as follows: "Swanson's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or laches." (Dkt. No. 73.)  Swanson argues that these defenses are frivolous.  To assert waiver, Lexington must show that Swanson/ICC intentionally and voluntarily relinquished its right to recover any insurance proceeds. See Jones v. Best, 134 Wn.2d 232, 241-42, 950 P.2d 1 (1998).  To assert an estoppel defense, Lexington must show that it justifiably relied on a promise by Swanson/ICC that it would not seek coverage for ICC's losses. See id. at 239.  Finally, to assert a laches defense, Lexington must show that Swanson/ICC knew it had a cause of action against Lexington for coverage but that it delayed seeking coverage and that the delay prejudiced Lexington's defense. See Davidson v. State, 116 Wn.2d 13, 25, 802 P.2d 1374 (1991).  Lexington does not address the waiver and estoppel defenses in its response.  Lexington has presented no evidence that Swanson intentionally and voluntarily relinquished her right as ICC's assignee to recover insurance proceeds.  To the contrary, Swanson has spent considerable time and resources in her efforts to recover funds owed to ICC.  Moreover, Lexington has not presented any evidence that ICC or Swanson promised to not seek coverage or that Lexington has suffered any prejudice.  In addition, the filing of this declaratory judgment action shortly after Swanson won the arbitration with ICC is evidence that Lexington did not rely on any promises by Swanson not to seek coverage.  Because Lexington has not presented any argument or evidence in support of its waiver or estoppel defenses,[9] and because the record suggests that neither of these defenses are viable, the Court dismisses Lexington's waiver and estoppel defenses.

Lexington argues that Swanson's counterclaims are barred by the doctrine of laches because Swanson caused the delay in settling the case when she (1) made an early demand for policy limits without offering any evidence to support her claim; (2) failed to provide expert testimony despite

---

[9]   The Court may consider Lexington's failure to respond to Swanson's argument on these two issues as an admission that Swanson's argument has merit.  Local CR 7(b)(2).

ORDER - 14

repeated requests for the information; and (3) held a mediation without sufficient advance notice to Lexington. But Lexington's argument confuses Swanson's capacity in this lawsuit. Lexington raised the affirmative defenses in answer to the counterclaims made by Swanson <u>as assignee for ICC</u>. Lexington's argument does not present any facts demonstrating that <u>ICC</u> was dilatory in raising any claims against Lexington for coverage. Because Swanson's conduct in her individual capacity is irrelevant to determining whether ICC's claims are barred by the doctrine of laches, and because Lexington has failed to present any evidence regarding ICC's conduct in this regard, the Court dismisses Lexington's laches defense.

### 2. Affirmative Defense No. 8 — Accord and Satisfaction

Lexington's eighth affirmative defense states that Lexington has no obligations to Swanson to the extent that Swanson's claims against Lexington are barred by accord and satisfaction. (Dkt. No. 73.) The defense of accord and satisfaction is met when the debtor tenders a check in full payment of the debt which is then accepted by the creditor. <u>U.S. Nat'l Bank Ass'n v. Whitney</u>, 119 Wn. App. 339, 350, 81 P.3d 135 (2003). No accord is established where the amount owed remains open to further negotiation. <u>Id.</u> at 351. In the present case, Swanson specifically rejected a check from Lexington labeled "full and final payment," and demanded that the check be re-issued. (Beninger Decl., Ex. 19.) Lexington complied with this request and re-issued the check without the additional language. (<u>Id.</u>) In addition, at the time the check was tendered, the parties were involved in two lawsuits addressing the coverage dispute. Therefore, the parties knew that the amount owed was disputed and open to negotiation. Finally, Lexington admits in its response that its accord and satisfaction defense applies only to damages paid in partial satisfaction of the judgment against ICC. But Lexington has already preserved the right to seek a setoff for any payments made in partial satisfaction of a judgment in its fourteenth affirmative defense. Because Lexington's accord and satisfaction defense is superfluous and unsupported by any evidence, it is dismissed.

ORDER - 15

### 3. Affirmative Defense No. 16 — Public Policy Considerations

Lexington's sixteenth affirmative defense states: "Swanson's claims are barred, in whole or in part, by public policy considerations." (Dkt. No. 73.) In its response, Lexington argues that this affirmative defense "operates as a function of Washington law, and should not be dismissed." (Resp. at 20.) In her reply, Swanson argues that Lexington has failed to present any legal support for this defense and that its failure to do so is fatal to its public policy defense. But Swanson never moved on this defense in her opening motion. The Court therefore declines to dismiss this defense.

### Conclusion

The Court GRANTS IN PART and DENIES IN PART Swanson's motion for partial summary judgment. First, the Court DENIES Lexington's motion for a rule 56(f) continuance. A continuance is not warranted because none of the affirmative defenses at issue in this motion implicate the Haelen cross-claim. Second, the Court DENIES Swanson's request to dismiss all of Lexington's affirmative defenses on timeliness grounds. Third, the Court GRANTS Swanson's motion to dismiss Affirmative Defenses Nos. 7 (waiver/estoppel/laches) and 8 (accord and satisfaction) because Lexington has failed to produce evidence to support these defenses. But the Court will not dismiss Affirmative Defense No. 16 (public policy) because Swanson failed to move on that defense in her opening motion.

Fourth, the Court DENIES both motions to strike. Swanson's motion is denied because it is moot and because Swanson provided no evidence that Lexington ever claimed the Sutherland testimony and documents at issue were privileged, and the exhibits are not privileged communications. Lexington's motion is denied because the arguments and evidence raised by Swanson in the reply brief are responsive to Lexington's motion and directly relate to issues raised in Swanson's original motion.

Finally, the Court GRANTS Swanson's motion to dismiss on nine of Lexington's contract related Affirmative Defenses (Nos. 1-3, 9-13, 15) because Lexington controlled ICC's defense for over two years without reserving the right to contest coverage. But the Court DENIES Swanson's

ORDER - 16

motion to dismiss Affirmative Defense No. 4 because Lexington does not need to reserve its rights with respect to policy limits.

Thus, the Court DISMISSES Affirmative Defenses Nos. 1-3, 7-13, and 15. Lexington may not advance these legal defenses either as affirmative defenses or as responses to Swanson's counterclaims.

The Clerk is directed to send copies of this order to all counsel of record.

Dated: May 23rd, 2007.

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge

ORDER - 17